IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL INDICTMENT |
| | ) | NO. |
| v. | ) | |
| | ) | 02:18-CR-0032-RWS |
| ERNEST LEANDER SHAW | ) | |
| _____ | ) | |

<u>SENTENCING MEMORANDUM</u>

ERNEST LEANDER SHAW, through counsel, submits this Sentencing Memorandum to assist the Court in its determination of a reasonable sentence that is sufficient but not greater than necessary to comply with the directives of 18 U.S.C. § 3553(a) and of *United States v. Booker*, 543 U.S. 20, 125 S. Ct. 738 (2005).

BACKGROUND

On January 4, 2019, Mr. Shaw entered a negotiated plea of guilty to Count One of the Indictment, admitting to having knowingly possessed one or more computers or storage devices which contained at least one visual depiction of a minor engaged in sexually explicit conduct which depiction had been transported in interstate commerce on or about May 1, 2018, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2) (Doc. 13 minute entry.) A pre-sentence report prepared for this case calculates the applicable guideline range as 78-97 months, based on a total offense level of 28 and a criminal history category of I. *See*

Presentence Report (PSR) at p. 13 (Part D "Sentencing Options"). Pursuant to the negotiated plea agreement, the government has agreed to recommend that Mr. Shaw be sentenced to 41 months imprisonment to be followed by a five-year term of supervised release. PSR at ¶ 8.

Mr. Shaw respectfully contends that the specific offense characteristics of Section 2G2.2 reflect "an unsound judgment" on the part of the commission, as the Supreme Court used that term in *Rita*, and should receive less deference in the determination of a final sentence than other factors contained in Section 3553(a) of Title 18 of the United States Code. *See Rita v. United States*, 552 U.S. 338, 127 S. Ct. 2456, 2468 (2007). For the reasons that follow, Mr. Shaw respectfully requests a time-served sentence with a five year term of supervised release. Such a sentence appropriately punishes Mr. Shaw for his offense conduct, effectuates the sentencing policies of Section 3553(a), accounts for significant mitigating factors, and results in a reasonable sentence in this case.

## ARGUMENT AND CITATION OF AUTHORITY

I.      This Court Must Determine a Reasonable Sentence by Weighing the Factors of Section 3553(a) of Title 18 of the United States Code

The Sentencing Guidelines promulgated by the United States Sentencing Commission provide an advisory rather than a mandatory regime for determining sentences.    *United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005) (citing *United States v. Booker*, 125 S. Ct. 738 (2005)).    The sentencing ranges produced

by the Guidelines are but generalizations.   *United States v. Hunt*, 459 F.3d 1180, 1184-85 (11th Cir. 2006).   The Court should consult the Guidelines as a part of its analysis, but the resulting range is but one factor that the Court must consider in arriving at a reasonable sentence. *Crawford*, 407 F.3d at 1178-79. In its consideration of the Section 3553(a) factors, the court may determine that the guideline sentence:

> should not apply, perhaps because (as the Guidelines themselves foresee) the case at hand falls outside the "heartland" to which the Commission intends individual Guidelines to apply, U.S.S.G. § 5K2.0, perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless.   *See* Rule 32(f).   Thus, the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure.

*Rita v. United States*, 127 S. Ct. 2456, 2465 (2007).

As *Rita* notes, guideline calculations expressly exclude consideration of certain offender characteristics. *Rita*, 127 S. Ct. at 2465; *see also Hunt*, 459 F.3d at 1184 n.4.   And, as the Supreme Court articulated in *Gall v. United States*, 128 S. Ct. 586 (2007), extraordinary circumstances are not required to justify an outside of the guideline sentence. *Gall*, 128 S. Ct. at 595. As the First Circuit explained in *Jimenez-Beltre*,

> the guidelines are still *generalizations* that can point to outcomes that may appear unreasonable to sentencing judges in particular cases. Some of the guidelines in particular cases were not reflections of existing practice but were deliberate deviations or turned tendencies into absolutes. Others have been affected by directions from Congress.

> *Booker*'s remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness.

*Jimenez-Beltre*, 440F.3d at 518 (citation omitted) (emphasis in original). After calculation of the custody range, it is within the Court's discretion to sentence within that guideline, or to impose a more severe or more lenient sentence than the applicable range, "provided the resulting sentence is reasonable in light of the § 3553(a) factors." *United States v. Shelton*, 400 F.3d 1325, 1334 (11th Cir. 2005); *see also Gall*, 128 S. Ct. at 595.

The ultimate command of Section 3553(a) is to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in" subsection (a). *Id.* This parsimony provision requires district courts to impose the minimum punishment needed to satisfy the purposes of sentencing: just punishment, deterrence, protection of the public and rehabilitation of the defendant. And it is the parsimony provision that serves as "the guidepost for sentencing decisions post-*Booker.*" *United States v. Ferguson*, 456 F.3d 660, 667 (6th Cir. 2006).

II.   The Court Should Not Give Deference to the Guidelines Here Because the Calculation Is Not Based on Empirical Facts nor National Experience and Impedes Application of the Section 3553(a) Factors

In the appropriate circumstances, a district court is within its discretion to not only sentence below the guidelines, but to base that sentence on arguments that

"contest[ ] the Guidelines sentence generally under § 3553(a) [including that] the Guidelines reflect an unsound judgment, or, for example, that they do not generally treat certain defendant characteristics in the proper way." *Rita*, 127 S. Ct. at 2468. The guideline at issue here suffers from these defects because of its mechanistic enhancement of the adjusted offense level, because it is lacking any empirical support, and because it is not the product of the Sentencing Commission's accepted processes.

In the appropriate circumstances, the district court is within its discretion to not only sentence below the guidelines, but to base that sentence on arguments that "contest[ ] the Guidelines sentence generally under § 3553(a) [including that] the Guidelines reflect an unsound judgment, or, for example, that they do not generally treat certain defendant characteristics in the proper way." *Rita*, 127 S. Ct. at 2468. The guideline at issue here suffers from these defects because of its mechanistic enhancement of the adjusted offense level, because it is lacking any empirical support, and because it is not the product of the Sentencing Commission's accepted processes.

Section 2G2.2 is not predicated on the Commission's exercise of its institutional role, is unsupported by empirical data or a cognizable penal theory, and treats first time offenders in a like manner to those guilty of more serious offenses and with more serious criminal history.   Although the Commission typically

develops guidelines utilizing an extensive and informative array of data gathered from prior sentencings in analogous cases, *see Rita*, 551 U.S. at 349, this empirical approach was abandoned in formulating Section 2G2.2.   *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010).   At the behest of Congress, the Commission has amended Section 2G2.2 numerous times since 1987, with ever harsher penalties, frequently over the Commission's protest. *See id*. at 184-85 & n.7 (citing Amendments and Commission statements, including implementation of the PROTECT Act, the promulgation of which excluded the Commission and eschewed its empirical methodology.)

A.     The Changes to the Guideline Were Obtained Without Factual Findings, Reasoned Debate, and Were Passed Over Objections by the Commission

The Protect Act, Pub. L. No. 108-21 (2003) forced changes upon the Sentencing Commission without study or evaluation.   The purpose of the Protect Act was to reconcile various bills, establish a nationwide Amber Alert system to be used in cases of child kidnaping, and to address virtual child pornography. Skye Phillips, *Protect Downward Departures: Congress and the Executive's Intrusion Into Judicial Independence*, 12 J.L. & Pol'y 947, 976-984 (2004) (hereinafter *Phillips*).[1]   As the legislation progressed, Freshman Congressman Tom Feeney

---

[1]     Additional information pertaining to the history of the child pornography sentencing guidelines referenced here may be found at Troy Sabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines*, available at

proposed an unrelated amendment to the bill that would directly amend various guidelines. *Id.; see also United States v. Detwiler*, 338 F. Supp.2d 1166, 1170-71 (D. Or. 2004) (examining history of Feeney Amendment).   Representative Feeney later admitted he was just the "messenger" for two Justice Department officials who authored the provision and chose not to notify or consult the Sentencing Commission. *Phillips*, at 983 n. 185, 986.   Debate on the amendment was limited to twenty minutes. *Id*. at 983.   The House later passed the Child Abduction Prevention Act with the Feeney Amendment added.   *Id*. at 992-994.   Despite objections by the Sentencing Commission, the Chairman of the House Committee on the Judiciary, the Judicial Conference of the United States, and the American Bar Association, all contending that these changes were being made without adequate review and analysis, the Protect Act became law in 2003.   *Id*. at 990-992, 991 n.219.

Contained in both the original Feeney Amendment and the final version of the Protect Act was a direct amendment to U.S.S.G. § 2G2.2, adding up to a five-level increase depending on the number of images possessed. *See Protect Act*, § 401(i)(1)(B),(C); U.S.S.G. Amendment 649.   The Protect Act also adjusted mandatory minimum sentences for receipt and distribution.   *Id*.   In an effort to

---

http://sentencing.typepad.com (June 10, 2008).

reconcile the provisions of the Protect Act, the Sentencing Commission was compelled to raise the base offense level to 22 for trafficking offenses. *See* Amendment 664. Other changes soon followed, in much the same pattern.

B.  The Sentencing Commission Has Confirmed the Unsupported Effects of the Feeney Amendment

On February 27, 2013, the Sentencing Commission submitted to Congress a report on Section 2G2.2, the result of a multi-year study by the Commission which examines federal sentencing policy, focusing primarily on non-production offenses, and compiles its findings and recommendations to Congress as to changes in the guideline.[2]   The Sentencing Commission, in the Report noted above has stated that:

> [t]he current sentencing scheme in § 2G2.2 places a disproportionate emphasis on outmoded measures of culpability regarding offenders' collections . . . [while a]t the same time, the current scheme places insufficient emphases on other relevant aspects of collecting behavior as well as on offenders' involvement in child pornography communities and their sexual dangerousness.

Report at 321.   Not surprisingly, the result is "overly severe guideline ranges for some offenders" in the former category, and "unduly lenient ranges for other offenders" in the latter category.   *Id*.

The Commission now recommends that § 2G2.2 be updated to "account more

---

[2]      U.S. Sent'g Comm'n, *Federal Child Pornography Offenses* (2013) (hereinafter "Report"), available at http://www.ussc.gov/Legislative_and_Public_ Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/201212_Fed eral_Child_Pornography_Offenses/index.cfm.

meaningfully for the current spectrum of offense behavior," and has asked Congress to enact legislation providing the Commission with express authority to amend the current guideline provisions that were enacted pursuant to earlier directives like the PROTECT Act, and to revise the entire guideline structure. Report at 322. The Department of Justice has agreed with this position. *Id*.

> (1.)   Impact of the PROTECT Act

In its Report, the Commission confirmed that guideline penalty ranges and average sentences have substantially increased in significant part because of the PROTECT Act of 2003. *See* Report at 315. The Commission has linked this increase to both the enhancements mandated by the Act, and changes in technology that have transformed the typical offense conduct thereby triggering those enhancements. *Id*. at 316.

The Commission's Report confirmed that four of the six enhancements in § 2G2.2(b), adding 13 points to the base offense level, now apply to the typical non-production child pornography offender. In fiscal year 2010, the relevant dataset at the time of the Report, the (b)(2) enhancement for possessing images depicting pre-pubescent minors applied in 96.1 percent of cases; the (b)(4) enhancement for possessing sadomasochistic images applied in 74.2 percent of cases; the (b)(6) enhancement for use of a computer applied in 96.2 percent of cases; and the (b)(7) enhancement for possessing numerous images applied in 96.9 percent of cases, with

69.6 percent of cases receiving the highest available increase for 600 or more images.

*Id*. at 316 & n.29. The Commission concluded that:

> Thus, sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders.   Higher penalty ranges and average sentences also have resulted from the statutory mandatory minimum penalties created by the PROTECT Act, which apply in approximately half of all §2G2.2 cases today and which result in higher base offense levels under the guidelines for offenders convicted of offenses carrying such mandatory minimum penalties

*Id.* at 316.

In today's technological world, the internet provides the typical means by which defendants obtain child pornography, resulting in an automatic two-level enhancement for use of computer. *See* U.S.S.G. § 2G2.2(b)(6). That the use of a computer is all but inherent to the crime of conviction is readily apparent, as confirmed by the Commission's finding that it applies in 96.2% of cases.

Furthermore, because of the speed of transmission made possible by advances in digital compression and the wide availability and accessibility of pornographic material, defendants readily obtain 600 images with minimal effort, resulting in a five-level increase.[3] *See* U.S.S.G. § 2G2.2(b)(7)(D). But the advance in technology

---

[3]      The Guidelines' treatment of videoclips exacerbates this problem. The 2004 Guidelines added an Application Note defining any video-clip as 75 images.   *See* U.S.S.G. § 2G2.2, App. Note 4(ii).   Thus one email containing eight, three-second video clips now triggers a five-level increase. Mr. Shaw's possession of numerous videos is responsible for 3,225 of the 4,954 images in this case. *See* PSR at ¶ 26.

has made the underlying number of images a significantly less reliable indicator of culpability. Rather, it tends to show nothing more than the speed of the respective defendant's internet connection and the ready availability of child pornography images, as was noted before the Sentencing Commission's public hearings:

> The bandwidth of highspeed Internet is hundreds of times faster than what it used to be just a short time ago. That is where you have massive downloads of files and can see hundreds and hundreds of pictures where you otherwise would not see that in past technology. That is just the speed of the Internet. That is the speed of technology.

Federal Child Pornography Crimes:   Public Hearings Before the United States Sentencing Commission, (February 15, 2012) (available at http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meeti ngs/20120215-16/Hearing_Transcript_20120215.pdf) [hereinafter "2012 Commission Hearings"] at 33 (testimony of Gerald R. Grant, Digital Forensics Investigator, Office of Federal Public Defender, Western District of New York, detailing advances in technology and speed of internet in facilitating download of child pornography).

The Commission recognized that considerably more often than not some of these images will contain material involving a prepubescent minor or material involving depictions of violence, thereby requiring an additional six-level increase. *See* U.S.S.G. §§ 2G2.2(b)(2) & (4). In 2015, of all sentences under this guideline

section, 94.5% involved an image of a prepubescent minor, and 82.6% involved an image depicting sadistic or masochistic conduct or other forms of violence. *See* United States Sentencing Commission, *Use of Guidelines and Specific Offense Characteristics for Fiscal Year 2015* at 46. As the Second Circuit noted in *Dorvee*, "[c]onsequently, adherence to the Guidelines results in virtually no distinction between the sentences for [child pornography possessors] and the sentences for the most dangerous offenders who, for example, distribute child pornography for pecuniary gain and who fall in higher criminal history categories." *Dorvee*, 616 F.3d at 187.

The changes made to the Guidelines that are the focus of *Dorvee* have a significant effect on this case. Under the pre-Feeney Amendment Guidelines of 2002, Mr. Shaw would have faced a guideline range of 37-46 months. Starting at a base offense level of 17, adding 2 levels for material involving a minor, 4 levels for depictions of violence, 2 levels for use of a computer, resulting in an offense level of 25, which, reduced by 3 levels of acceptance of responsibility, results in an offense level of 21. *See* U.S.S.G. §2G2.2(a), (b)(1)-(5) (2002). With a Criminal History category of I, the resulting range is 37-46 months, as compared to the currently calculated (and more than doubled) range of 78-97 months. PSR at ¶ 13 (Part D: Sentencing Options).

13

(2.)   <u>The Emerging Consensus Is that Section 2G2.2 Should Not Receive Deference</u>

In addition to the Second Circuit's analysis in *Dorvee* and the Report from the Commission, other courts have recognized the infirmity and unreliability of the guideline calculation suggested in Section 2G2.2, and have imposed or upheld variances and departures from the guideline for that reason. In *United States v. Grober*, the Third Circuit held that the district court did not err in sentencing a defendant at the mandatory minimum, finding that § 2G2.2 "is not worthy of the weight afforded to other Guidelines" because, in part, it's mechanical application caused an "outrageously high" sentence. *See United States v. Grober*, 624 F.3d 592, 595, 607 (3d Cir. 2010). The First Circuit has also criticized a district court for failing to use its *Kimbrough* discretion to disregard § 2G2.2, while emphasizing that "we wish to express our view that the sentencing guidelines at issue are in our judgment harsher than necessary." *United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009); *see also United States v. Henderson*, 649 F.3d 955, 963–64 (9th Cir. 2011).

In *United States v. Johnson*, 588 F. Supp.2d 997 (S.D. Iowa 2008), a case in which the Government urged the sentencing court to give substantial deference to the child pornography guideline, the Court stated:

> At the urging of Congress, the Sentencing Commission has amended the guidelines under § 2G2.2 on several occasions over the past two

> decades, recommending more severe penalties.   As far as this Court can tell, these modifications do not appear to be based on any sort of empirical data, and the Court has been unable to locate any particular rationale for them beyond the general revulsion that is associated with child exploitation-related offenses.   Thus, because the guidelines at issue in this case do not reflect the unique institutional strengths of the Sentencing Commission in that they are not based on study, empirical research, and data, this Court . . . affords them less deference than it would to empirically-grounded guidelines.

*Johnson*, 588 F. Supp.2d at 1003-04 (citations omitted); *see also Detwiler*, 338 F. Supp.2d at 1170-71 (discussing Feeney Amendment to Protect Act).

> 3.     The Eleventh Circuit Has Held that a District Court May Consider the 2013 Report in Choosing the Ultimate Sentence in a Case Impacted by Section 2G2.2

In *United States v. Cubero*, a child pornography defendant raised the issue of the Sentencing Commission's 2013 Report in an attack on the procedural and substantive reasonableness of his sentence. *See United States v. Cubero*, 754 F.3d 888, 898-901 (2014). In support of his argument, the defendant contended that a remand was appropriate because the district court did not give the appropriate level of consideration to the findings of the Commission's Report in deriving its sentence. *Id*. at 899.

The Eleventh Circuit rejected this argument, noting that the Report itself does not alter the need for the court to calculate the advisory guideline, does not limit the court's discretion under Section 3553(a), and does not require the Court to vary

downward. *See id*. at 900. The court further noted that the sentencing court had acted procedurally reasonable. *See id*. at 901. However, in so finding, the Court explicitly emphasized that a district court is empowered with the discretion to consider the findings of the Report in its calculus: "a district court may certainly consider the 2013 report in choosing the ultimate sentence." *Id*. at 900. Thus, this Court may consider the Commission's findings in determining what weight to give Section 2G2.2 given both the findings of the Report, the statistics supporting its conclusions that have been gathered by the Commission since its issuance, and the specifics of Mr. Shaw's case.

II.     The Section 3553(a) Factors Counsel a Time-Served Sentence

        A. Nature of the Offense

        In April of 2018, Mr. Shaw leant his son and his son's fiancée a Blue Ray disc player for them to watch videos. PSR at ¶ 14. While using it, the couple found thumbnail images of deleted files that looked like child pornography. *Id*. Concerned, Mr. Shaw's son contacted police, who in turn contacted Mr. Shaw about the contents found on the Blue Ray player. *Id*. at ¶ 15. At the time it was late in the afternoon, so investigators asked Mr. Shaw if he would come down to the station the next day to answer some questions.

        Mr. Shaw presented himself at the Jackson County Sheriff's Office the next

morning, having told his family members that he was likely to be arrested. *Id*. He admitted to owning the player, and admitted to officers that he had downloaded pornography by using a USB thumb drive, but suggested that the child pornography had been on a drive that he had found at an adult video store in Atlanta, claiming to have later destroyed the drive. *Id*. at ¶ 16. Although he initially tried to conceal his offense, he consented to a search of his residence, phones, and other electronic devices, including giving investigators passcodes to those devices, which disclosed the presence of additional child pornography. *Id*.

Mr. Shaw was charged by Jackson County, who made efforts to determine if there had been any contact victims or local minors involved in the production of the images. These efforts included review of the extant image by investigators and issuing a press release asking for any potential victims to come forward. *Id*. at ¶ 20. No contact victims were identified. *Id*. Mr. Shaw's son also cast doubt on the idea that he would have physically abused anyone. *Id*. Mr. Shaw has been in continuous custody, first at the Jackson County Jail in Jefferson, Georgia from May 1, 2018 until his initial appearance in this case on October 19, 2018, and thereafter at Hall County Jail and the Robert A. Deyton Detention Center. *Id*. at ¶ 12.

B. History and Characteristics of the Defendant

Several aspects of Mr. Shaw's personal life present mitigating facts that this

Court should consider in arriving at a reasonable sentence. Mr. Shaw's difficult childhood involved horrible alcoholic paternal figures that inflicted physical pain on him or his mother or both. In spite of these difficulties, Mr. Shaw was able to not only finish high school and complete an associate's degree, but he also served honorably in the military for a number of years. Mr. Shaw has no criminal history. Finally, Mr. Shaw has significant medical issues that warrant consideration in determining a reasonable sentence in his case.

1. Mr. Shaw's Difficult Childhood

Mr. Shaw was the victim of significant abuse when he was young enough to be a toddler, abuse that he received at the hands of his biological father, who was an alcoholic. PSR at ¶ 44. According to Mr. Shaw's mother, her then husband Harold Shaw routinely beat Mr. Shaw with the buckle end of a belt, finally abandoning the family when Mr. Shaw was still only five years of age. *Id*.

Mr. Shaw's mother remarried another physically abusive alcoholic in Royce Sims when Mr. Shaw was 11 years old, but Mr. Shaw's stepfather focused most of his violence on his wife. *Id*. The violence was extreme and escalated over time, culminating in an incident in which Sims broke all of the bones on one side of Mr. Shaw's mother's face; Mr. Shaw was in college at the time, and his mother called him home so that he could take her to the hospital. *Id*. All told, Mr. Shaw's mother

remained married to Sims for 22 years, finally leaving him when Mr. Shaw was 33 years old. *Id.*

### 2. Mr. Shaw's Military Service

In spite of these difficult experiences, Mr. Shaw completed his degree at Winder Barrow High School in June of 1970. PSR at ¶ 51. He volunteered for service in the Marine Corps in September of that year, at a time when the war in Vietnam was spreading to Cambodia and Laos. *Id.* at 45. He remained in the Corps until October of 1974, having risen to the rank of corporal before his honorable discharge. *Id.* Mr. Shaw continued in the Inactive Reserves from 1974 until 1978, and was in Active Reserves from 1980 to 1982. *Id.* As the Presentence Report notes, military service may be relevant in determining the appropriateness of a departure under Section 5H1.11 of the Sentencing Guidelines. PSR at p. 14. This Court may also consider Mr. Shaw's service in arriving at a reasonable sentence under Section 3553(a) of Title 18.

### 3. Mr. Shaw's Health Issues

After his last two years in the military, Mr. Shaw enrolled in Gainesville Junior College, now the University of North Georgia, completing his Associates in Arts degree in 1984. *Id.* at ¶ 52. He worked as a substitute teacher for approximately 20 years, but health issues became an increasing problem for him. *Id.* at ¶¶ 53-54.

19

His first heart attack occurred in 1992, his second in 1996, and a third in 2001, after which Mr. Shaw received quintuplet bypass surgery. *Id*. at ¶ 47. His most recent heart-related surgery was in 2015, when he had artery bypass surgery. *Id*.

Mr. Shaw's heart condition and diabetes are the likely reasons for his foot amputation. In August of 2018, approximately four months after he went into Jackson County custody, he had to have the majority of his left foot removed. *Id*. While in federal custody, he has received an emergency hospitalization due to acute chest pain, has had to receive repeated care for his stump scab reopening, and unfortunately has an abscess on his right foot, which was the precursor to his left foot amputation. He has been confined to a wheelchair since his surgery in August of last year.

4.  Mr. Shaw's Lack of Criminal History at 66 Years of Age

Mr. Shaw has no criminal history. The Pre-sentence Report calculates Mr. Shaw's criminal history score as zero, and further notes that: he has no juvenile adjudications; no adult criminal convictions; no offense behavior not part of relevant conduct; no other criminal conduct; and no other pending charges other than those related to the instant case. *See* PSR at ¶¶ 35-40. But for the case before the court, in his sixty-six years, Mr. Shaw has been a veteran, a teacher, and a law-abiding and productive citizen. He also has no history of substance abuse. *Id*. at ¶ 50.

Mr. Shaw's criminal history score does not adequately countenance this fact. As the Sentencing Commission recently noted, a criminal history score of zero does not necessarily mean an offender had no prior criminal history. *See* U.S.S.C., "The Criminal History of Federal Offenders: Key Findings" (May 17, 2018) ("Almost one in ten offenders in fiscal year 2016 had a criminal history score of zero but had at least one prior conviction") (available at https://www.ussc.gov/research/research-reports/criminal-history-federal-offenders). A criminal history category of I would apply equally to a young adult with uncountable juvenile convictions; an older defendant with convictions outside the countable time period; to a defendant who at the time of their federal sentencing faced other pending state charges of some magnitude; or to a defendant with a history of entanglement with law enforcement that had managed to avoid conviction.

Although his criminal history category is based on the fact that Mr. Shaw has no prior countable convictions, it does not account for the absence of criminal conduct of any sort or the fact that he has otherwise been a model of rectitude throughout his mature life. This fact alone has been a basis for a departure under a mandatory guidelines regime. *See United States v. Ward*, 814 F. Supp. 23 (E.D. Va. 1993) (departure warranted because guidelines fail to consider length of time defendant refrains from commission of first crime, until age 49).

Mr. Shaw's lack of criminal history and significant medical problems suggest that he is unlikely to be a recidivist. *See* 18 U.S.C. § 3553(a)(2)(B)-(C) (requiring Court to consider need of sentence to afford adequate deterrence and to protect public from further crimes of defendant). The Commission's recent recidivism study demonstrated that offenders with zero criminal history points have a lower recidivism rate than offenders with even just one criminal history point, and that offenders with zero criminal history points and no prior contact with the criminal justice system have an even lower recidivism rate still. *See* United States Sentencing Commission, "Amendments to the Sentencing Guidelines" at 73 (April 20, 2018) (available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20180430_RF.pdf) (citing Tracey Kyckelhahn & Trishia Cooper, U.S.S.C., "The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders," at 6–9 (2017)).

As the Supreme Court stated in *Koon*, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). An understanding of Mr. Shaw's history and offense indicates that he is someone who has led an otherwise

commendable and law-abiding life, but has made a serious mistake in judgment that has shattered his family life, his physical health, and his reputation. Although his conduct in the instant case is worthy of opprobrium, he is also deserving of respect for the life he has otherwise lived.

As of the date of sentencing, Mr. Shaw will have already served 426 days of continuous incarceration, a custody period that has been significantly more arduous than that served by the average pretrial detainee. A sentence of time served with a significant period of supervision is an appropriate sentence here, and would not necessarily create a sentencing disparity, at least not as to other similarly-situated defendants. In many cases, courts have not only departed or varied from the applicable guideline, but have imposed a sentence that varied significantly from the range suggested by Section 2G2.2 in order to account for the unique characteristics of the defendant. *See United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) (defendant required to comply with outpatient psychiatric monitoring and management during five-year probationary period); *United States v. Rowan*, 530 F.3d 379 (5th Cir. 2008) (sixty month period of probation not procedurally erroneous); *United States v. Stall*, 581 F.3d 276 (6th Cir. 2009) (sentence of one day incarceration and ten years of supervised release substantively and procedurally reasonable); *United States v. Duhon*, 541 F.3d 391 (5th Cir. 2008) (following remand

from Supreme Court for reconsideration in light of *Gall*, sixty month period of probation held to be substantively reasonable); *United States v. Prisel*, 316 Fed. App'x 377 (6th Cir. 2008) (downward variance to one day incarceration and eighteen months home confinement substantively and procedurally reasonable); *United States v. Saenz*, No. 07-05-CR-877 (S.D. Texas 2011) (defendant sentenced to 5 years of probation with first 24 months on home confinement with electronic monitoring where defendant had been abused as a child); *United States v. Fulkerson*, No. 10-CR-0526-MMA (S.D. Cal. 2010) (defendant had significant medical problems); *United States v. Manke*, No. 09-CR-172, 1010 U.S. Dist. LEXIS 3757 (E.D. Wis. 2010) (defendant possessed more than 1200 images, chatted with others to obtain more images, made progress in mental health treatment before sentencing); *United States v. DeHaven*, No. 08-CR-31 LRR (N.D. Iowa 2009) (defendant had social anxiety disorder and a strong work history); *United States v. Shore, No*. 06-CR-00335-LKK (E.D. Cal. 2007) (defendant was victim of molestation, possessed over 4,500 images, and shared images); *United States v. Graci*, No. 2:09-CR-00131-LS-1 (E.D. Pa. 2009) (defendant, a former elementary school teacher, purchased access to child pornography websites on three different occasions); *United States v. Birdsall*, No. 11-CR-134 (D.N.J. 2011) (20-year-old offender who collected more than 1800 images and 74 videos using file-sharing software); *United States v.*

*Malakoff*, No. 1:09-CR-00051 (D.D.C. 2009) (defendant was sexually abused as a child and suffers from post traumatic stress disorder); *United States v. Meillier*, 650 F. Supp. 2d 887 (D. Minn. 2009) (defendant was mentally disabled and had been the victim of sexual abuse); *United States v. McDonald*, No. 3:08-CR-30031 (D. Mass. 2008) (defendant underwent therapy); *United States v. Rausch*, 570 F. Supp. 2d 1295 (D. Colo. 2008) (defendant had multiple health problems); *United States v. Boyden*, No. 2:06-CR-20243-LFZ (E.D. Mich. 2007) (defendant purchased access to three child pornography websites over a number of years and searched for illegal images); *United States v. Butler*, No. 1:07-CR-00466 (M.D. Pa. 2008) (defendant was in his sixties with no prior criminal conduct); *United States v. Rubino*, No. 4:08-CR-00114 (M.D. Pa. 2009) (defendant was a mentally challenged man with prior drug convictions who possessed 25 disks containing child pornography); *United States v. Colby*, No. 09-CR-20401 (E.D. Mich. 2010) (78-year-old defendant with health issues who distributed, received, and possessed illegal images through file-sharing program); *United States v. Boyd*, No. 06-CR-20243 (E.D. Mich. 2005) (defendant with social deficits); *United States v. LaFrance*, No. 02-CR-81048 (E.D. Mich. 2005) (young defendant who went to trial, exchanged images); *United States v. Smith*, No. 09-CR-0740 (E.D. Mo. 2010) (defendant had strong family and community support); *United States v. Angel*, No. 09-CR-00401 (M.D. Fla. Apr. 28,

2011) (defendant was 75-year-old with medical needs); *United States v. Machmer*, No. 04-CR-097 (E.D. Va. Mar. 3, 2005) (defendant had significant social skill development issues); *United States v. Horton*, No. 06-1880 (D. Ariz. Dec. 19, 2007) (defendant was old and had health problems, possessed more than 600 images); *United States v. Driskell*, No. 08-CR-641 (E.D. Mo. 2009) (defendant had illegal images available for distribution through file-sharing program, but took steps to delete illegal images, had significant family obligations); *United States v. Jones*, No. 04-CR-1840 (D.N.M. 2004) (defendant had Asperger's syndrome and family obligations); *United States v. Huffman*, No. 09-CR-20073 (D. Kan. 2010) (defendant was young and attending treatment); *United States v. Teagno*, No. 09-CR-0328 (E.D. Va. 2009); *United States v. Simpson*, No. 08-CR-0267 (E.D. Va. 2008) (65-year-old defendant with health problems); *United States v. Miller*, No. 05-CR-00974 (N.D. Ill. 2006) (defendant possessed five illegal videos and an additional 32 deleted illegal images); *United States v. Carpenter*, No. 08-CR-06256 (W.D.N.Y. 2009) (defendant possessed several videocassettes containing at least 150 illegal images); *United States v. Colon-Rodriguez*, No. 07-CR-00481 (D.P.R. 2008); *United States v. Calderon-Sabalier*, No. 06-CR-0122 (D.P.R. 2006); *United States v. Hill*, No. 08-CR-00208 (W.D. Okla. 2009) (defendant had been sexually abused, obtained and shared images through file-sharing); *United States v. Morrison*, No. 08-CR-167

(E.D. Cal. July 18, 2011) (defendant was 70 years old, government agreed to sentence); *United States v. Flores*, No. 09-CR-60100 (D. Or. July 28, 2010) (defendant a 23-year military veteran, lost $1.9 million in retirement benefits as a result of conviction, scrubbed computer to eliminate evidence); *United States v. Pustis*, No. 10-CR-60038 (D. Or. Aug. 24, 2010) (sentenced to five years' probation where guideline range was 87-108 months, as well as a $20,000 fine, where defendant was over 50 years old, and presented little risk of committing further crimes); *United States v. Van Dusen*, No. 08-CR-60136 (D. Or. Jan. 19, 2010) (sentenced to one day in prison plus up to one year in a residential reentry center and 10 years of supervised release); *United States v. Wright*, No. 09-CR-311 (D.D.C. Apr. 15, 2010) (sentenced to 5 years' probation with the special condition that the defendant continue in mental health treatment and perform 600 hours of community service); *United States v. Ramos*, No. 08-CR-30034 (D. Mass. Jan. 13, 2010) (sentenced to 4 years' probation, 12 months of which in a halfway house, where defendant had no criminal history and had suffered from major depression over many years); *United States v. Teves*, 11-CR-10351 (D. Mass. July 31, 2012) (sentenced to 5 years' probation, the first six months on home confinement with electronic monitoring); *United States v. Proulx*, 11-CR-10274 (D. Mass. Feb. 16, 2012) (sentenced to 5 years of probation, the first 6 months on home detention with

electronic monitoring); *United States v. Arzberger*, No. 08-CR-894 (S.D.N.Y. Apr. 16, 2010) (sentenced to 5 years of probation where guideline range was 41-51 months); *United States v. Connelly*, No. 07-CR-830 (D.N.J. Dec. 22, 2008) (sentenced to 5 years of probation and a $1000 fine where guideline range was 78-97 months); *United States v. Stewart*, No. 05-CR-242 (D.N.J. Sept. 30, 2005) (sentenced to 3 years of probation with 12 months home confinement); *United States v. Young*, No. 09-CR-252 (W.D. Mich. Feb. 5, 2010) (sentenced to one day in prison followed by 7 years of supervised release, and a fine of $7,000)); *United States v. Grosinsky*, No. 08-CR-20090, 2008 WL 5062845 (E.D. Mich. Nov. 25, 2008) (sentenced to one day in prison followed by 5 years of supervised release, and 100 hours of community service); *United States v. Syzmanski*, No. 08-CR-417 (N.D. Ohio June 1, 2011) (sentenced to one day in prison followed by 5 years of supervised release); *United States v. Camiscione*, 04-CR-594 (N.D. Ohio June 24, 2010) (as modified on August 19, 2010) (sentenced to one day in prison followed by 3 years of supervised release with 16 weeks of intermittent confinement, and 6 months of home detention with electronic monitoring); *United States v. Bistline*, No. 09-CR-085 (S.D. Ohio Jan. 9, 2013) (sentenced to one day in prison followed by 10 to 5 years' probation); *United States v. Tucker*, No. 11-CR-00252 (M.D. Fla. June 22, 2012) (sentenced to time served (one day) followed by 15 years of supervised

release, with 18 months in home detention with electronic monitoring); *United States v. Bender*, 12-CR-128 (M.D. Fla. Jan. 25, 2013) (sentenced to time served (one day) followed by 10 years of supervised release with two years on home confinement).

Mr. Shaw respectfully acknowledges his guilt for the crime he has pleaded guilty to – he is in fact, quite ashamed to be in this predicament, and mortified that some of the collateral consequences of his own conduct have been visited upon his son and other family members that have been dealing with the ignominy of his offense since the Jackson County press release. However, consideration of Mr. Shaw's unique history and characteristics, including his military service, lack of criminal history, and significant health issues, should mitigate his punishment.

Mr. Shaw's health issues alone warrant consideration of sentencing alternatives. As Section 5H1.4 notes, "in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." U.S.S.G. § 5H1.4. The Guidelines instruct that home detention is a possible condition of supervised release as a substitute for imprisonment. *See* U.S.S.G. § 5F1.2. This Court may also consider these issues in reaching a reasonable sentence in this case under the factors of Section 3553(a). *See* 18 U.S.C. § 3553(a).

## CONCLUSION

A sentence of time served followed by five years of supervised release is a

reasonable sentence for Mr. Shaw. This sentence would adequately serve the sentencing purposes of Section 3553(a) and effect the minimum punishment needed to satisfy the purposes of sentencing – just punishment, deterrence, protection of the public, and rehabilitation of the defendant. *See* 18 U.S.C. § 3553(a) (court should impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in" subsection (a)).

Respectfully submitted, this 25th day of June, 2019.

s/ *Richard B. Holcomb*
RICHARD B. HOLCOMB
GEORGIA STATE BAR NO. 360333
ATTORNEY FOR MR. ERNEST LEANDER SHAW

Federal Defender Program, Inc.
Suite 1500, Centennial Tower
101 Marietta Street, N.W.
Atlanta, Georgia 30303
Telephone:   404-688-7530
Facsimile:   404-688-0768
richard_holcomb@fd.org

CERTIFICATE OF SERVICE

I hereby certify that the foregoing SENTENCING MEMORANDUM is formatted in Times New Roman 14 pt., in accordance with Local Rule 5.1B, and was electronically filed this day with the Clerk of Court using the CM/ECF system and hand delivered to the office of the following Assistant United States Attorney of record:

> Sekret T. Sneed
> Assistant United States Attorney
> 600 Richard B. Russell Building
> 75 Spring Street, S.W.
> Atlanta, Georgia 30303

Dated:   This 25th day of June, 2019.

> s/ *Richard B. Holcomb*
> RICHARD B. HOLCOMB
> GEORGIA STATE BAR NO. 360333
> ATTORNEY FOR MR. ERNEST LEANDER SHAW